```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

BRIANNA PAIGE VINCENT, et al.       :
    Plaintiffs,                     :
                                    :    Case No. 3:04CV491 (JBA)
v.                                  :
                                    :
ESSENT HEALTHCARE OF CONNECTICUT,   :
et al.,                             :
    Defendants.                     :
```

**RULING ON DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL [DOC. #253]**

In this obstetric malpractice case claiming <u>inter alia</u> birth trauma brain injury (<u>see</u> Second Am. Compl. [Doc. #72]), defendants Mortman, M.D., Physicians for Women's Health ("PWH"), and Sharon Ob/Gyn filed a Motion for Disqualification [Doc. #253] pursuant to Conn. R. Prof'l Conduct 1.9 and 1.10, seeking to disqualify plaintiffs' counsel from further representation of plaintiffs. For the reasons that follow, the Court denies defendants' Motion.

**I. Factual Background**

The claimed basis for disqualification of plaintiffs' law firm stems from the May 5, 2006 lateral move of Attorney Paul T. Edwards from the law firm of Danaher, Lagnese & Neal, P.C. ("Danaher") to become a partner at Stratton Faxon, the firm representing plaintiffs. Edwards had worked for Danaher since 1993, becoming partner in 1999. (Edwards Aff. ¶ 3.) Danaher consists of 18 lawyers and focuses on insurance defense work.

1

(Defs. Mem. at 4.)  According to Paula P. Greenberg, Vice President of PWH's parent corporation, and Joyce A. Lagnese, principal of Danaher, Danaher "has represented PWH and or its physicians in approximately 95% of their malpractice matters," totaling "38 matters, 13 of which alleged birth injury," since 1997.  (Greenberg Aff. ¶¶ 15, 17; Lagnese Aff. ¶¶ 8, 10.)  While Edwards did not represent Mortman or Sharon Ob/Gyn while at Danaher, and Danaher was not retained to represent defendants in this matter due to "a potential conflict of interest" (Greenberg Aff. ¶ 20), he "worked on 12 separate matters for PWH physicians or their predecessor practices [ ] all of which involved allegations of malpractice and potential medical malpractice claims" (Lagnese Aff. ¶ 18).  Greenberg avers that, "while at the Danaher Firm, [Edwards] did work on birth trauma cases for PWH physicians or their predecessor practices.  Specifically he worked on Ladd v. Fishman, Huhn v. Goldstone-Orley and Gumbardo v. Tejeda, all of which involved brain injury claims."
(Greenberg Aff. ¶ 38.)  Lagnese also states:

> Edwards participated in both formal and informal discussions about [ ] PWH matters . . . concerning not only the specific facts of a given situation but also the concerns and strategies of PWH in defending malpractice matters. . . . For instance, on February 6, 2006, PWH held a claims review meeting attended by Mr. Edwards and five other attorneys from the Danaher Firm, as well as officers and agents of PWH . . . [where] the strategy in each of the pending claims handled by the Danaher Firm [was discussed].

(Lagnese Aff. ¶¶ 26, 27.)

2

On Edwards's last day at Danaher, partners Lagnese and Neil Danaher "wrote to Mr. Edwards to advise him of potential conflicts of interest in his new affiliation with Stratton Faxon" and specifically listed PWH as an "entit[y] to which our concerns apply." (Lagnese Aff. ¶ 32; id. at Ex. B.) Immediately after Edwards's move was announced in the CT Law Tribune on May 15, 2006, Greenberg wrote Edwards asking him to "please advise whether you believe that the PWH client confidences can be protected despite Stratton Faxon's representation of plaintiffs against PWH defendants," specifically referencing Vincent and another case, Klein v. Miller.[1] (Greenberg Aff. at Ex. B.)

Edwards responded that he "did not handle any PWH birth trauma cases while at Danaher" and that Stratton Faxon "adopted and implemented policies and procedures that have been memorialized in writing to serve as a screening mechanism (also known as a 'chinese wall') to segregate all material and information in the Vincent case from [him], and vice versa."

---

[1] Klein v. Bristol Hospital is an obstetric malpractice case against a doctor and a PWH d/b/a. Defendants' supplemental memorandum [Doc. #277] appends an opinion from Klein, dated October 12, 2006, which denies a disqualification motion brought under Conn. Rule of Prof'l Conduct 1.10(b) in Klein and in a similar case, Cwikla v. Bloom, based on Edwards's affiliation with Stratton Faxon. The Superior Court found the issues in those cases to be sufficiently distinct from Edwards's prior representation such that there was insubstantial risk of use of confidential factual information. However, the court ordered Edwards to "adhere strictly to the screening procedure put in place by the Stratton firm regarding the Klein matter." (See Supplem. Mem., Ex. A at 27.)

3

(Id. at Ex. C.)  Later, Edwards admitted having confused the Klein and Vincent cases: the 'Chinese Wall' was implemented in the Klein Case, not the Vincent Case, and Edwards promised not to do work in the Vincent Case.  (Greenberg Aff. ¶ 40; Edwards Aff. ¶ 19.)

**II. Legal Standard**

The moving party bears "the heavy burden of proving facts required for disqualification," Evans v. Artek Sys. Corp., 715 F.2d 788, 794 (2d Cir. 1983), which decision is left to the "broad discretion" of district courts, A.V. By Versace, Inc. v. Gianni Versace, S.P.A., 160 F. Supp. 2d 657, 662-63 (S.D.N.Y. 2001).  Rules of conduct provided by the ABA and the various states "merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification," Hempstead Video, Inc. v. Inc. Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005).  "Recognizing the serious impact of attorney disqualification on the client's right to select counsel of his choice, we have indicated that such relief should ordinarily be granted only when a violation of the Canons of the Code of Professional Responsibility poses a significant risk of trial taint."  See Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981) (citing Armstrong v. McAlpin, 625 F.2d 433, 444-46 (2d Cir. 1980) (en banc), vacated on other grounds and remanded, 449 U.S. 1106 (1981); Bd. of Educ.

4

v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979)).

In addition courts must balance three competing interests: "(1) the client's interest in freely selecting counsel of her choice, (2) the adversary's interest in the trial free from the risk of even inadvertent disclosures of confidential information, and (3) the public's interest in the scrupulous administration of justice."  Hull v. Celanese Corp., 513 F.2d 568, 570 (2d Cir. 1975).

With respect to conflicts of interests involving former clients, "[t]he key inquiry is whether the present and former matters are 'substantially related,'" Norris v. City of New Haven, 2006 WL 2567866, at *1 (D. Conn. Sept. 5, 2006) (MRK), and disqualification should only be granted "upon a showing that the relationship between the issues in the prior and present cases is patently clear' or where the issues are 'identical' or 'essentially the same,'" Bergeron v. Mackler, 623 A.2d 489, 493-94 (Conn. 1993).  "A subsequent matter is substantially related to an earlier matter . . . if there is a substantial risk that the subsequent representation will involve the use of confidential information of the former client obtained in the course of the representation."  The Law Governing Lawyers, Restatement 3d, § 132 at 380-81.

### III. Discussion

Professional rules of conduct do not bind this Court's broad

5

discretion in deciding motions to disqualify.  See Glueck, 653 F.2d at 748; Hempstead Video, 409 F.3d at 132.  The rules and their commentary provide guidance, but Second Circuit courts must also conduct a balancing of interests.  See Hull, 513 F.2d at 570.

### A. Rules of Conduct

Rule 1.9 of the Connecticut Rules of Professional Conduct, which has been adopted in this District, governs conflicts of interest concerning former clients:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> (1) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
>
> (2) Use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

Conn. R. Prof'l Conduct 1.9.  The Commentary to Rule 1.9 advises, "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client." (Id. at cmt.)

The individual attorney conduct regulated by Rule 1.9 extends to other lawyers by association under Rule 1.10, "Imputed

Disqualification:"

> (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.
>
> (b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9 (2) that is material to the matter.

Conn. R. Prof'l Conduct 1.10(a), (b).  The Rule 1.10 Commentary offers the following considerations for lawyers moving laterally:

> First, the client previously represented must be reasonably assured that the principle of loyalty to the client is not compromised.  Second, the rule of disqualification should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel.  Third, the rule of disqualification should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association. . . .   If the concept of imputed disqualification were defined with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel.

(Id. at cmt.)

### B. "Substantially Related" Analysis

Defendants argue that, because Edwards worked on PWH cases and obtained information about PWH strategy while at Danaher, Edwards's conflict of interest with respect to defendants is imputed to Stratton Faxon.  There is no claim that Edwards or Danaher ever represented either Dr. Mortman or Sharon OB/Gyn.

7

(See Edwards Aff. ¶ 9.)  In moving for disqualification, defendants emphasize that Edwards worked on three obstetrical malpractice cases while at Danaher, Ladd, Huhn, and Tejeda (see Greenberg Aff. ¶ 38).  In the Ladd "birth injury case involving two members of PWH" and implicating "strategy-type issues," Lagnese testified that Edwards "handled a mediation," logging 14.7 hours.  (Lagnese Klein Hr'g Tr., Pl. Ex. B, at 31-32.)  With respect to the Huhn and Tejeda cases, the record demonstrates that Edwards's participation preceded those clients' affiliation with PWH.  (Edwards Klein Hr'g Tr., Aug. 21, 2006, Pl. Ex. B, at 72; Greenberg Klein Hr'g Tr., Aug. 21, 2006, Pl. Ex. B, at 20, 56.)

   Plaintiffs state that "[t]he most that can be said about the prior cases [that Edwards worked on] is that they involved unrelated malpractice claims against other PWH-affiliated obstetricians."  (Pl. Opp. Mem. at 25.)  Edwards testified that he viewed PWH as "an organization for which there apparently was vicarious liability and beyond that the cases and the confidential information I had in the cases was all confidential with respect to the individual physician's involvement in the case. . . .  There may have been one case in which PWH was actually a named defendant that I was handling, and it was just for vicarious purposes only."  (Edwards Klein Hr'g Tr., Aug. 21, 2006, Pl. Ex. B, at 197.)  Despite his having attended the

8

February 2006 claims review committee meeting, Edwards denied learning "anything about the strategies or philosophies or protocols of PWH as it relates to case evaluation or settlement" that he did not already know from another source.  (Edwards Klein Hr'g Tr., Aug. 28, 2006, Pl. Ex. B, at 38; see also Edwards Aff. ¶¶ 13, 14.)  Plaintiffs argue that defendants have failed to meet their burden of establishing anything particularly unique or confidential about techniques of medical malpractice defense representation that Edwards risks using adversely to PWH and have "provided no specificity whatsoever about the confidential information supposedly possessed by Mr. Edwards" (id. at 32-33).

Joel Faxon of Stratton Faxon explained the initial conflicts identification process used at the firm:

> a. We identified medical malpractice cases currently in our office, and initially determined for ourselves which of those cases involved defendants represented by the Danaher Firm.  We asked Mr. Edwards to do the same based upon his own careful review of the parties' names.
>
> b. We also asked Mr. Edwards to identify any pending Stratton Faxon medical malpractice cases involving parties who at any time were represented by the Danaher Firm, to the best of his knowledge.

(Faxon Aff. ¶ 7) (emphasis in original).)  Faxon stated that Edwards "does not work on" Vincent, but admitted that "there is no screening memorandum like there is in Klein" in place at the firm with respect to Vincent.  (Faxon Klein Hr'g Tr., Pl. Ex. B, at 73; Klein screening mem., Faxon Aff. at Ex. 1.)  According to

9

Edwards, "no Screening Procedure was implemented at Stratton Faxon in Vincent because Vincent, unlike Klein, was never handled by the Danaher Firm during my employment there (or at any time)." (Edwards Aff. ¶ 16.)

On the facts presented, the Court finds that Stratton Faxon's representation of plaintiffs is not substantially related to Edwards's past work for PWH entities while at Danaher so as to warrant disqualification of Stratton Faxon on this case.  Neither Edwards nor Danaher ever represented Mortman or Sharon OB/Gyn, and Edwards appears only to have worked on one obstetrical malpractice case involving PWH while at Danaher, Ladd.  The record has revealed no "patently clear" relationship between Edwards's prior representation in obstetrical malpractice cases at Danaher and Stratton Faxon's current representation of the plaintiffs.  Edwards has had no involvement in the instant case since joining Stratton Faxon.[2]  As defendants have detailed the allegations at issue in Ladd, there is no showing that these "prior and present cases" are "essentially the same."  See Bergeron, 623 A.2d at 493-94.  Because Edwards's client representation at Danaher is not shown to be substantially related to Stratton Faxon's representation here,

---

[2] Even if a screen were in place, the Court notes that the Second Circuit has expressed skepticism about the efficacy of screening in "a relatively small firm."  See Cheng v. GAF Corp., 631 F.2d 1052, 1058 (2d Cir. 1980).

10

disqualification, as in Klein, would extend the imputed disqualification rule beyond its intended limits.

**C. Balancing of Interests**

The conclusion that imputed disqualification has not been demonstrated under Rules 1.9 and 1.10 does not abrogate an appropriate balancing of interests of the client and adversary. See Hull, 513 F.2d at 570.  First, Stratton Faxon's clients, Heather and Brianna Vincent, would be significantly prejudiced by the disqualification of their counsel as trial approaches (March 2007).  After numerous extensions of the trial date, a firm and final date has been set and retention of an entirely new law firm would likely result in compromised trial representation.  As well, it is well established that courts should be deferential to clients' choice of counsel.  As Judge Shorthall noted in Klein, PWH includes 160 physicians, and "there are about 400 physicians actively practicing obstetrics and gynecology in Connecticut; so, the Stratton firm would be disqualified from bringing suit against 40% of the obstetrics and gynecology practitioners in the state," had disqualification in Klein been required.  (Klein Ruling at 13, 15, Defs. Supplem. Mem. at Ex. A.)  Disqualifying Stratton Faxon here would similarly limit the choice of counsel of future potential obstetrical malpractice plaintiffs.

Second, as no conflict of interest has been found to exist, PWH and the other defendants will not be prejudiced by the

11

continuing representation of plaintiffs by Stratton Faxon.  While defendants, like all litigants, are entitled to the continuing loyalty of their previous counsel, as set out in Conn. R. Prof'l Conduct 1.9, as neither Danaher nor Edwards is or was ever involved in this suit or its issues, the defendants' interests have not been harmed.

Third, the public interest will be better served by keeping this case on track for trial with the counsel who have represented the parties all along.  The duplicative costs of bringing in new counsel and pressures to delay the start of trial of this nearly three-year-old case would undermine one of the Congressional purposes underlying the Civil Justice Reform Act — reducing delay and cost in civil litigation in federal courts. See 28 U.S.C. § 471 et seq.

**IV. Conclusion**

For the foregoing reasons, defendants' Motion to Disqualify [Doc. #253] is DENIED.

IT IS SO ORDERED.

/s/

JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 12th day of December, 2006.**